*Decision will be entered under Rule 50.*

WILLIAM TIFFIN DOWNS AND HELEN C. DOWNS, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3026-64.   Filed February 27, 1968.

*Robert J. MacMichael*, for the petitioners.
*Joseph F. Dillon*, for the respondent.

534

OPINION

The principal issue in this case is whether payments of $12,750 received by petitioner in 1959 from American Metal were consideration for the transfer of all substantial rights to a "patent" within the provisions of section 1235,[3] as contended by petitioner, or were compensa-

---

[3] SEC. 1235. SALE OR EXCHANGE OF PATENTS.

(a) GENERAL.—A transfer (other than by gift, inheritance, or devise) of property consisting of all substantial rights to a patent, or an undivided interest therein which includes a part of all such rights, by any holder shall be considered the sale or exchange of a capital asset held for more than 6 months, regardless of whether or not payments in consideration of such transfer are—

    (1) payable periodically over a period generally coterminous with the transferee's use of the patent, or

    (2) contingent on the productivity, use, or disposition of the property transferred.

(b) "HOLDER" DEFINED.—For purposes of this section, the term "holder" means—

    (1) any individual whose efforts created such property, * * *

tion for services rendered within the meaning of section 61(a)(1),[4] as asserted by respondent.

Briefly stated, section 1235 provides that a transfer of property consisting of all substantial rights to a patent by an individual whose efforts created the property is treated as the sale of a capital asset held for more than 6 months. Section 1.1235–2(a), Income Tax Regs., clarifies the use of the word "patent" by declaring it unnecessary for the patent or patent application for the invention to be in existence if the requirements of section 1235 are otherwise met.

A determination of ownership of the patent rights in an invention is critical to the application of section 1235. *Roland Chilton*, 40 T.C. 552 (1963). On the facts of this case it is plain that American Metal held the patent rights to the electric hospital bed at all times and did not receive such rights by transfer from petitioner.

The concept of the electric hospital bed originated, for the purposes of this record, with the personnel of the University of Michigan Medical Center and was adopted by American Metal. American Metal then began to search for a mechanical engineer with experience in related areas who could reduce the idea to a tangible, workable form. American Metal's interviews with petitioner about the project, and petitioner's work exclusively on it after becoming associated with the company, demonstrate clearly that petitioner was retained for the purpose of bringing the electric hospital bed concept into fruition. Working with two supervisors of American Metal, petitioner accomplished this purpose and, pursuant to the terms of the 1956 contract, assigned all his rights in the invention to American Metal.

In the benchmark case of *United States* v. *Dubilier Condenser Corporation*, 289 U.S. 178, 188 (1933), the Supreme Court stated:

[An invention] is the result of an inventive act, the birth of an idea and its reduction to practice; the product of original thought; a concept demonstrated to be true by practical application or embodiment in tangible form. [Citations omitted.]

Though the mental concept is embodied or realized in a mechanism or a physical or chemical aggregate, the embodiment is not the invention and is not the subject of a patent. This distinction between the idea and its application in practice is the basis of the rule that employment merely to design or to construct or to devise methods of manufacture is not the same as employment to invent.

Since petitioner was paid to reduce to practical application a concept originated by American Metal, the patent application in his name

---

[4] SEC. 61. GROSS INCOME DEFINED.

(a) GENERAL DEFINITION.—* * * gross income means all income from whatever source derived, including (but not limited to) the following items:

(1) Compensation for services, * * *

and in the names of two other employees of American Metal was held for American Metal. *Standard Parts Co.* v. *Peck*, 264 U.S. 52 (1924). The assignment provisions in the 1956 contract merely affirmed American Metal's preexisting patent rights in the subsequently developed invention. No substantive rights were "transferred" by the 1956 contract or the assignment executed on March 30, 1959.

Our conclusion that there was no "transfer" within the meaning of section 1235 is reinforced by the provisions of section 1.1235–1(c) (2), Income Tax Regs.[5] Whether the payments received by petitioner were "compensation for services rendered as an employee" is a question of fact. That petitioner was considered an employee by American Metal is shown by the requirement that petitioner submit bimonthly vouchers, "To bill you [American Metal] for services rendered under contract," in order to receive his payments, by its characterization of him as an "Engineering Consultant," and by its payment to him, along with its other employees, of a $600 Christmas bonus. Indeed, the fact that petitioner reported the payments as ordinary income in 1956, 1957, and 1958 is some evidence that he also considered the payments as compensation for services rendered.

But the terms of the 1956 contract are the strongest evidence that the payments were made under a "contract of employment." The contract, under which petitioner agreed to abide by American Metal's employee rules and regulations, refers to petitioner's "employment" and "employ" with American Metal. The payments of $1,000 per month were not dependent upon the sale or use by American Metal of any patent rights resulting from petitioner's efforts.[6] His association with American Metal, and consequently the payment made in consideration for his labors, could be terminated at the will of the company. Finally, petitioner convenanted to assign all rights he might have in inventions developed by his efforts "without further consideration." This last provision clearly reveals that the development of a patentable

---

[5] Sec. 1.1235–1(c)(2). *Payments to an employee.* Payments received by an employee as compensation for services rendered as an employee under an employment contract requiring the employee to transfer to the employer the rights to any invention by such employee are not attributable to a transfer to which section 1235 applies. However, whether payments received by an employee from his employer (under an employment contract or otherwise) are attributable to the transfer by the employee of all substantial rights to a patent (or an undivided interest therein) or are compensation for services rendered the employer by the employee is a question of fact. In determining which is the case, consideration shall be given not only to all the facts and circumstances of the employment relationship but also to whether the amount of such payments depends upon the production, sale, or use by, or the value to, the employer of the patent rights transferred by the employee. If it is determined that payments are attributable to the transfer of patent rights, and all other requirements under section 1235 are met, such payments shall be treated as proceeds derived from the sale of a patent.

[6] Although the evidence is not entirely clear, we think the raises provided for in the 1964 and 1965 amendments to the agreement were more closely related to increases in the cost of living than to increased sales of the bed.

invention, an electric hospital bed, was the principal object of petitioner's employment.

Since section 1235 is inapplicable, we must determine the tax consequences of the contractual arrangement between petitioner and American Metal under the general provisions of the Code. Sec. 1.1235-1(b), Income Tax Regs. With regard to facts similar to those in the present case, this Court stated in *Arthur N. Blum*, 11 T.C. 101, 108, 110 (1948), affd. 183 F. 2d 281 (C.A. 3, 1950), a case decided under the Internal Revenue Code of 1939, which had no special provision for patent transfers comparable to section 1235 :

The answer to this controversy involves a determination of the ownership of the patents. * * *

\*     \*     \*     \*     \*     \*     \*

In the instant case, one of the terms of employment was that petitioner was to devote his attention to the adaptation of the chain saw which the company hoped to manufacture and sell. * * *

\*     \*     \*     \*     \*     \*     \*

Applying the established law relative to the rights of employer and inventor to the specific employment contract in question, we conclude that the patents involved were the exclusive property of the company. Petitioner's only interest therein was to receive the compensation provided in such employment agreement. No sale of patents or other capital assets was included.

On facts distinguishable from those present here, this Court in *Roland Chilton, supra* at 562, declared the established law to be :

If a person is employed by another "to invent" a specific product or specific products, the fruits of the employee's labor, the invention, belongs to his employer. [Citations omitted.]

The payment to the employee is for his labor, not for the product, "the invention." The payment is therefore compensation for services and taxable as such. * * *

Accordingly, we conclude on this record that petitioner was employed "to invent a specific product" and that the payments he received were compensation for services rendered, and taxable as ordinary income under section 61(a)(1).

The second issue relates to rent and utility expenses and travel costs claimed by petitioner to be "ordinary and necessary"[7] to his business of inventing. We find that petitioner is not entitled to deduct a portion of the rent and utility expenses relating to his personal residence.

---

[7] SEC. 162. TRADE OR BUSINESS EXPENSES.

(a) IN GENERAL.—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including—

\*     \*     \*     \*     \*     \*     \*

(3) rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity.

We are unable to allow as a deduction a portion of those expenses allocable to petitioner's work at home on the electric hospital bed because he has failed to prove (1) the amount of time he worked on the bed at home (which appears from the record to have been minimal) and (2) any proximate relationship between this work and the successfully completed bed. In the absence of such proof, we cannot find such expenses to be "ordinary and necessary."

Petitioner further argues that he was engaged in general inventive endeavors in his home with the ultimate motive of securing patents, the rights to which he could sell at a profit. Petitioner's research company was closed after a tax sale in 1957, and during 1959 petitioner in no way held himself out to the public as engaged in a going business. The record does not reflect that petitioner kept special equipment in his house which was not available at American Metal facilities or at the tool shop he frequented. He worked alone on certain unspecified projects, none of which has, to date, ripened into a patented device or process. Petitioner did not show any efforts on his part to manufacture any product of his inventive efforts carried out at home or any attempt to sell to others the patent rights.

American Metal considered petitioner's job to be full time, as evidenced by the 1956 agreement in which petitioner agreed to work regular hours during the week including Saturday mornings. Although American Metal did not rigidly enforce these working hours, petitioner worked almost exclusively on the electric bed during 1959.

"Ordinary and necessary" expenses under section 162 and "research or experimental expenditures" under section 174 [8] are deductible only when related to the carrying on of a "trade or business." The concept of "trade or business" was not intended to encompass all activities engaged in for profit, but was used in the realistic and practical sense of a going trade or business. *John F. Koons*, 35 T.C. 1092 (1961). Whether a particular enterprise qualifies is a fact question.

The facts here are persuasive that petitioner's endeavors were merely preparatory to a possible business enterprise which was, during 1959, prospective only. Moreover, petitioner failed to establish any reasonable expectancy that he would realize a profit. *Best Universal Lock Co.*, 45 T.C. 1 (1965). "Expenditures made in investigating a potential new trade or business, or preparatory to entering into such business, do not, in our opinion, qualify for the application of section 174(a)(1)" *John F. Koons, supra* at 1101. The same is true for qualification under section 162. Therefore, we hold that petitioner is not entitled to deduct

---

[8] SEC. 174. RESEARCH AND EXPERIMENTAL EXPENDITURES.

  (a) TREATMENT AS EXPENSES.—

    (1) IN GENERAL.—A taxpayer may treat research or experimental expenditures which are paid or incurred by him during the taxable year in connection with his trade or business as expenses which are not chargeable to capital account. The expenditures so treated shall be allowed as a deduction.

any portion of the rental and utility expenses incurred on his personal residence.

Finally, petitioner claims a $811.20 deduction for travel expenses based upon an average cost of 8 cents a mile for every mile driven to and from the Faiss tool shop. We find that such trips were an "ordinary and necessary" step toward the successful completion of petitioner's work on the electric hospital bed. Moreover, we do not view the costs as related to "commuting" expenses. The shop had facilities unavailable at either the American Metal plant or at petitioner's home. Since the bed involved new and radical concepts of design, we are persuaded that special tooling machines were necessary to its construction.

Petitioner's estimate of 5 trips to the machine shop a week seems reasonable. Since he does not claim any other business use of his automobile for the year 1959, an allocation of 8 cents a mile to the business use is appropriate under the circumstances. Petitioner has established the number of trips, the number of miles per trip, a business purpose for the trips, and the work performed at the destination. This proof satisfies the requirements of specificity set out in *Karl R. Martin*, 44 T.C. 731, 744 (1965), reversed and remanded in part, 379 F. 2d 282 (C.A. 6, 1967). Cf. *Best Universal Lock Co.*, *supra.* Therefore, based upon 8 cents per mile, 30 miles per round trip and 5 trips per week, we hold that petitioner is entitled to a travel deduction in 1959 of $624.

To reflect the agreement by the parties on some issues and the conclusions reached in this opinion,

*Decision will be entered under Rule 50.*