**Herbert S. and Arlene S. LEHMAN, Appellants,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Appellee.**

**No. 227, Docket 87–4058.**

United States Court of Appeals, Second Circuit.

Argued Nov. 6, 1987.

Decided Dec. 15, 1987.

James B. Lewis, New York City, for appellants.

Robert S. Parish, Jr., Atty., Tax Div., Dept. of Justice, Washington, D.C. (Michael C. Durney, Acting Asst. Atty. Gen., Michael L. Paup, Richard Farber, Attys., Tax Div., Dept. of Justice, Washington, D.C., of counsel), for appellee.

Before LUMBARD, PIERCE and MINER, Circuit Judges.

LUMBARD, Circuit Judge.

Herbert and Arlene Lehman appeal from a judgment of the United States Tax Court following a trial before Special Trial Judge James M. Gussis determining a deficiency of $8,320 in their federal income tax for 1981. The case was assigned to Judge Gussis under § 7456(d)(3) of the Internal Revenue Code of 1954 (redesignated as § 7443A(b)(3) by § 1556 of the Tax Reform Act of 1986, Pub.L. 99–514, 100 Stat. 2755) and Rules 180, 181, and 182 of the Tax Court Rules of Practice and Procedure.[1] It is reported unofficially at T.C.M.Dec. (P–H), para. 87,158 (1987). Appellants appealed the judgment to us under § 7482 of the Code. They claim that the tax court misapplied § 1235 of the Code, which accords capital gains treatment to amounts received by an inventor as consideration for the transfer of a patent, by finding that an incentive award received from International Business Machines Corporation (IBM) in 1981 by Herbert Lehman (employed by IBM since 1960 as a chemist) in recognition of a patent he transferred to IBM in 1965 did not qualify for capital gains treatment under § 1235. The Commissioner maintains that the tax court properly characterized the corporate incentive award at issue as taxable as ordinary income under § 61 of the Code, rather than as capital gain under § 1235, because the award was not received in exchange for Lehman's assignment of his patent rights to IBM. We affirm the decision of the tax court.

I.

Herbert Lehman was a chemist employed by IBM in Poughkeepsie, New York

---

**1.** Section 2 of the Tax Reform Act of 1986, Pub.L. No. 99–514, 100 Stat. 2085, has redesignated the "Internal Revenue Code of 1954" as amended as the "Internal Revenue Code of 1986." The year at issue in this appeal, however, antedates the Tax Reform Act of 1986, and, for clarity, the relevent provisions at issue here will refer to the Internal Revenue Code of 1954.

throughout 1981. He was first employed as a chemist by IBM in 1960. The parties agree that he was not employed as an inventor. At the time he commenced his employment, he agreed to assign his rights in all future inventions to IBM.[2] In accordance with this agreement, on June 30, 1965, he assigned to IBM his entire right, title and interest in his invention called "Method for Controlling the Electrical Characteristics of a Semiconductor Surface." The assignment also assigned to IBM Lehman's entire right, title and interest in a pending patent for that invention; that patent was subsequently granted to Lehman and was assigned Patent Number 3402081.

In May 1981, Lehman received from IBM an award of $30,000 based on Patent Number 3402081. This award was granted under an incentive award plan maintained by IBM, the basic purpose of which, according to literature distributed by IBM to its employees, is to "recognize employee achievements of significant or outstanding value, especially those that are beyond the levels of expected performance in the assigned jobs." The award was treated as part of the $96,733.40 of "wages, tips, and other compensation" on the W–2 Form issued by IBM to Herbert Lehman for the 1981 tax year. A letter from IBM to Herbert Lehman dated March 19, 1982 stated in part

that "the award was granted to you above and beyond your normal compensation."

On Schedule D of their joint income tax return for 1981, appellants characterized the award as being in respect to the transfer of an invention or patent right and accordingly treated it as a capital gain under § 1235 of the Code. The Internal Revenue Service determined that the $30,000 award was ordinary income, not a capital gain under § 1235, and issued a statutory notice of deficiency of $8,320 in federal income taxes on January 30, 1985.

Agreeing with the IRS's characterization of the payment, Judge Gussis concluded that the corporate award was ordinary compensation for services rendered by Lehman to IBM within the meaning of § 61(a)(1) of the Code because it did not constitute consideration for the transfer of an invention or patent right under § 1235. In reaching its decision, the court relied on the following facts: (1) that as a condition to his employment, Mr. Lehman had agreed to transfer all rights to any products or processes he might invent during his employment without any consideration in addition to any compensation that he might receive from IBM during the course of his employment, (2) that he received no pay-

2. As a condition of his employment by IBM, Mr. Lehman executed an "Employment Agreement Relating to Inventions and Confidential Information." The agreement provided, in pertinent part, as follows:

IN PART CONSIDERATION of my employment by the International Business Machines Corporation:

\* \* \* \* \* \*

3. It is understood that the terms and conditions of Paragraphs 4 and 5 below of this agreement shall be effective only if I am now or may hereafter be designated as an officer of IBM or as an employee with executive, managerial, technical, engineering, customer engineering, sales engineering, development or research duties.

4. I further hereby sell, transfer and assign to IBM, its successors and assigns, my entire right, title and interest in and to all inventions, improvements, ideas and suggestions, whether patentable or not, and copyrightable material (all hereinafter referred to as "Developments"), made or conceived by me, solely or jointly, during the period of my designation as set forth in Paragraph 3 above, and six

(6) months after such period, in or relating to methods, apparatus, products or components thereof which, prior to the end of my employment, are manufactured, sold, leased, used or under development by, or pertain to the business of IBM.

5. I further agree promptly to disclose all such Developments to the President or acting head of IBM, or to any other person designated by him, and on request promptly to execute and deliver without further consideration, formal transfers and assignments of all such Developments for the United States and foreign countries, as well as all other documents and papers and do all other reasonable acts, required to enable IBM to apply for and secure Letters Patent or Copyright therefor in the United States and foreign countries.

6. I further agree that this agreement constitutes the entire agreement with IBM with respect to the subject matter hereof and shall supersede all previous communications, representations, understandings, and agreements, either oral or written, with IBM or any official or representative thereof with respect to the subject matter of this agreement.

ment at the time he transferred the rights to IBM in 1965, and (3) that the award was not made until 16 years after the transfer.

## II.

On the undisputed facts, we agree with the tax court that this case presents the question of whether the $30,000 payment made in 1981 by IBM under its incentive award program to Herbert Lehman was (1) compensation which is to be treated as ordinary income under § 61 of the Internal Revenue Code of 1954, or (2) a payment made in exchange for Lehman's assignment of his patent rights which would be treated as capital gain under § 1235.

Section 1235 of the Internal Revenue Code provides in relevant part:

(a) A transfer (other than by gift, inheritance, or devise) of property consisting of all substantial rights to a patent, or an undivided interest therein which includes a part of all such rights, by any holder shall be considered the sale or exchange of a capital asset ... regardless of whether or not payments in consideration of such transfer are—

(1) payable periodically over a period generally coterminous with the transferee's use of the patent, or

(2) contingent on the productivity, use, or disposition of property transferred....

The purpose of this section is to allow inventors to treat patent royalties as capital gains, even though they might otherwise be treated as ordinary income.[3] The primary requirement to obtain this favorable treatment is that the payment be in exchange for the transfer of property consisting of "all substantial rights to a patent." Where, as here, there is an employment relationship between the transferor and transferee the question arises whether payments made by an employer to an employee who has agreed to assign his patent rights to his employer are payments made in consideration for the transfer under § 1235 or simply additional ordinary income to the employee.

The question of whether payments by an employer to an employee are within the scope of § 1235 is to be answered by consideration of the facts and circumstances under which the employer makes payments to the employee.[4] This is the ap-

---

**3.** The Senate Report indicates that § 1235 was added in response to judicial and administrative uncertainties with respect to the taxation of royalty-type payments in patent transfer cases. *See* S.Rep. No. 1622, 83d Cong., 2d Sess. (1954), *reprinted in* 3 U.S.Code Cong. & Ad. News 4621, 5081–5082. The origin of these uncertainties can be traced to *Myers v. Commissioner,* 6 T.C. 258 (1946) and the Commissioner's acquiescence (1946–1 Cum.Bull. 3) and later withdrawal of the acquiescence (*see* Mim. 6409, 1950–1 Cum.Bull. 9) in the *Myers* decision. Although the *Myers* decision did not directly consider the impact of the existence of periodic and contingent royalty-type payments on its "sale or exchange" analysis, Mimeograph 6409 announced the Commissioner's position that such periodic and contingent royalty-type payments would not be accorded capital gains treatment. Judicial decisions subsequent to this announcement appeared to conflict with this position. (*Compare Kronner v. United States,* 110 F.Supp. 730, 126 Ct.Cl. 156 (1953) *and Allen v. Werner,* 190 F.2d 840 (5th Cir.1951) *with Bloch v. United States,* 200 F.2d 63 (2d Cir.1952)). Section 1235, in effect, overruled the position taken in the mimeograph by allowing capital gains treatment for periodic royalty-type payments in the case of qualifying transactions. In addition, the statute extended the preferential long-term capi-

tal gains treatment to patents which would not otherwise qualify as capital assets or which have not been held for six months. *See* S.Rep. No. 1622, *supra,* at 113–114 (1954), *reprinted in* 3 U.S.Code Cong. & Ad.News 4621 at 4747. *See generally Fawick v. Commissioner,* 436 F.2d 655, 661–62 (6th Cir.1971).

**4.** Section 1.1235–1(c)(2) of the Treasury Department's Regulations provides as follows:

Payments received by an employee as compensation for services rendered as an employee under an employment contract requiring the employee to transfer to the employer the rights to any invention by such employee are not attributable to a transfer to which section 1235 applies. However, whether payments received by an employee from his employer (under an employment contract or otherwise) are attributable to the transfer by the employee of all substantial rights to a patent (or an undivided interest therein) or are compensation for services rendered the employer by the employee is a question of fact. In determining which is the case, consideration shall be given not only to all facts and circumstances of the employment relationship but also to whether the amount of such payments depends upon the production, sale, or use by, or

proach taken in several tax court cases that have considered § 1235. *See Beausoleil v. Commissioner*, 66 T.C. 244 (1976); *Downs v. Commissioner*, 49 T.C. 533 (1968); *McClain v. Commissioner*, 40 T.C. 841 (1963); *Chilton v. Commissioner*, 40 T.C. 552 (1963). It was the approach followed by the tax court in this case, and, for the most part, we adopt that approach.

■ Unlike the tax court, however, we believe that neither the fact that Herbert Lehman did not receive compensation at the time he assigned the rights to his patent, nor the fact that he did not receive the award until sixteen years after the transfer, militates against finding that the payment was within § 1235. In fact, it seems to us that § 1235 was designed to grant capital gains treatment to such delayed payments when the payments satisfy the basic requirement of § 1235 that the payments in question were made in consideration of the transfer of patent rights.

■ Nevertheless, we agree with the holding of the tax court that Lehman's receipt of the 1981 incentive award from IBM does not qualify for capital gains treatment because it was not made in consideration of the transfer of his patent rights in 1965. We reach this conclusion on two independent grounds.

First, we interpret Herbert Lehman's employment agreement with IBM as not requiring IBM to provide any consideration for Lehman's transfer of patent rights in addition to his continuing employment and the ordinary compensation that follows from that relationship which includes the agreement to assign any patent rights that he might obtain during the course of his employment by IBM. We interpret this language to mean that the payment made by IBM to Herbert Lehman is to be characterized as ordinary income in the form of compensation for his employment, not as consideration for the transfer of the patent that he assigned to IBM in 1965.

Second, we believe that the tax court decisions in *Beausoleil*, *McClain*, and *Chilton, supra*, provide a principled distinction between (1) royalty-type payments made by an employer directly in consideration of the assignment of a patent by an employee which qualify under § 1235 and (2) payments that recognize in a more general manner the contributions of an employee who has assigned certain patent rights to his employer but which do not qualify under § 1235 because they were not made in consideration of the transfer of patent rights.

In *McClain*, the taxpayer, in consideration of his employment, had agreed to assign to his employer all inventions relating to his employer's business that he might make during his employment. McClain developed two patentable inventions during the course of his employment by Lockheed and executed assignments of the relevant patents to Lockheed. At some time after the transfer, during McClain's period of employment, Lockheed announced through a series of publications to its employees that it was implementing a program for paying employees specified percentages of income received by Lockheed as the result of its sale or licensing of employee inventions to third parties.

The plan in *McClain*, though terminable by Lockheed at its discretion, had several important provisions that distinguish it from the IBM plan at issue here. First, even if it was terminated by Lockheed, awards would be given to employees for patents assigned prior to the change or discontinuance of the plan. Second, an employee who had assigned patent rights either before the plan was created or while the plan existed was to share in revenue or royalties at a specified rate. Unlike the IBM plan at issue in this case, therefore, whether the employee received awards and the amount of those awards were unrelated to any subjective judgments by his employer about his continuing performance. Third, an employee whose assignment of

the value to, the employer of the patent rights transferred by the employee. If it is determined that payments are attributable to the transfer of patent rights, and all other require-

ments under section 1235 are met, such payments shall be treated as proceeds derived from the sale of a patent.

patent rights was covered by the plan would continue to share whether or not he remained with Lockheed. Fourth, if an employee covered by the plan were to die prior to the expiration of the assigned patent, his designated heirs were to receive the continuing awards. The tax court found that, as the program was operated, the awards in question should be treated as consideration for the transfer of patent rights under § 1235, and consequently accorded the payments capital gains treatment.

In *Chilton,* the taxpayer also had an agreement with his employer to assign to his employer all patent rights for inventions he might produce during the course of his employment; the taxpayer was to receive a 2½% royalty on the sales of articles manufactured and sold by the employer that were covered by the assigned patents. Like the taxpayer in *McClain,* Chilton's receipt of these amounts was not conditioned on his continued employment because the royalties were to continue for the life of the patents. The tax court found that these amounts were made in respect of the transfer of patents he had produced and therefore constituted capital gains under § 1235.

Like the case currently before us, the *Beausoleil* case also involved an IBM incentive program. Under the program at issue in *Beausoleil,* IBM employees received a specified number of points for each patentable invention that they produced and assigned to IBM under an employment agreement similar to the agreement at issue in this case. Over time, employees accumulated points; IBM would then make a cash distribution once they had accumulated a specified number of points. The taxpayer in *Beausoleil* received one of these awards and sought to characterize it as a capital gain under § 1235. The IRS maintained that the amounts were ordinary income. The tax court agreed with the IRS's assessment of a deficiency because its examination of the facts indicated that the award to the taxpayer was not made in consideration of the transfer to IBM of the rights to his invention as required by § 1235.

The *Beausoleil* court distinguished the *McClain* and *Chilton* decisions by stating "the payments [made in *McClain* and *Chilton*] were royalties geared to the use by, and profitability of the invention for, the employer. Moreover, the employees in those cases were to receive royalty payments for the life of the patent despite termination of their employment by the corporation...." 66 T.C. at 250. We believe that the approach taken by the tax court in *Beausoleil, supra,* both in its construction of § 1235 and treatment of the *McClain* and *Chilton* decisions, was sound because it recognized the important distinction between payments received from an employer which if made to an outsider would constitute royalty payments and payments made to an employee that could represent additional ordinary income.

The distinction made by these decisions parallels our belief that the exception from § 61 created by § 1235 for periodic payments made in consideration for the transfer of patent rights should not be extended to payments that include an element of ordinary compensation for services. It is true that some of the bonus received by Herbert Lehman in 1981 was in recognition of the value of the patent he transferred to IBM—if he had never transferred the patent to IBM, he would not have received the $30,000 award under the incentive program. We also believe, however, that the bonus represented ordinary income in the form of compensation for Herbert Lehman's continuing contributions to IBM—if he was no longer employed by IBM or if his job performance had become substandard, under the terms of the program as set forth in the explanatory materials distributed by IBM to its employees, it seems quite unlikely that IBM would have given him the $30,000 award in 1981. Neither his employment agreement nor the terms of IBM's incentive program give us a basis either for determining that the award was given solely in recognition of the patent assignment, or for designating part of the bonus as compensation for continuing service and part as consideration for the patent. Since we cannot identify that portion of the award that is in recognition of the

assignment, and because we do not believe that Congress intended that the entire award, including the part which is merely compensation for services, be treated as capital gains, we must agree with the tax court that the entire award constitutes ordinary income under § 61 rather than a capital gain under § 1235.

The decision of the tax court is affirmed.